**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BILLINGS DIVISION**

| | |
|---|---|
| **CROW TRIBAL HOUSING AUTHORITY,** | **Case No. CV-06-51-BLG-RFC** |
| **Plaintiff,** | |
| **vs.** | **ORDER RE:** **CROSS-MOTIONS FOR** **SUMMARY JUDGMENT** |
| **UNITED STATES DEPARTMENT OF HOUSUING AND URBAN DEVELOPMENT, et al.,** | |
| **Defendants.** | |

**I.** **INTRODUCTION**

Plaintiff Crow Tribal Housing Authority ("CTHA") brings this action against Defendant U.S. Department of Housing and Urban Development ("HUD") under the Administrative Procedure Act challenging the HUD's agency action of recouping alleged over-payments of Indian Housing Block Grants ("IHBG") to CTHA under the Native American Housing Assistance and Self-Determination Act of 1996 ("NAHASDA"), 25 U.S.C. § 4101 *et seq.* Pending before the Court are cross-motions for summary judgment. Docs. 51 & 60. For the following reasons, the Court concludes this case must be remanded to HUD for a proper hearing.

1

## II.    FACTUAL BACKGROUND

CTHA has been receiving monies from HUD under the Native American Housing Assistance and Self-Determination Act of 1996 (NAHASDA) since 1998. NAHASDA, directs the Secretary of HUD to provide annual grants to Indian tribes or tribal housing authorities in support of their need for affordable housing.

In 2001, HUD audited numerous tribal housing authorities across the nation to determine whether these housing authorities were improperly receiving federal payments through NAHASDA to be applied toward federally-funded lease-to-own housing programs. Federal payments under NAHASDA were made through a block-grant formula that included two separately calculated components: 1) Formula Current Assisted Housing Stock units; and 2) Need. 24 C.F.R. § 1000.301-1000.340. Formula Current Assisted Stock ("FCAS") units include low rent, Mutual Help and Turnkey III housing units.[1] The amount of grant money each tribe is to receive based in part on the recipient's FCAS–the inventory of rental units and lease-to-own units owned by the recipient as of September 30, 1997, the effective date of NAHASDA.

---

[1]    Mutual Help and Turnkey III programs are federal lease-to-own housing programs for Native Americans wherein the tribal housing authority maintains housing units in its inventory and conveys them when they are paid-off or when the lease term ends.

The FCAS units calculation for an individual Tribal Housing Authority begins with the number of dwelling units owned or operated by that entity at the time of NAHASDA's enactment. Beginning in 1997, Plaintiff Crow Tribal Housing Authority was responsible for maintaining, repairing, insuring and accounting for approximately 600 houses, including rentals, Mutual Help and Turnkey houses. 42 U.S.C. § 1437d. Over the years, some lease-to-own units would become eligible to be transferred from the CTHA's initial inventory or be otherwise disposed of based on the terms of the agreement between the CTHA and the housing unit's occupant. At that time, title to the residence would be transferred from the CTHA to the occupant.

On an Annual Formula Response Form, the Tribal Housing Authority would report this transfer and HUD would make a downward adjustment in the FCAS units calculation. 24 C.F.R. § 1000.312. This adjustment would be equal to the number of dwelling units a tribe "no longer has the legal right to own, operate, or maintain ... whether such right is lost by conveyance, demolition, or otherwise." 24 C.F.R. § 1000.318(a). Units are to be removed from a Tribal Housing Authority's inventory "as soon as practicable after the unit becomes eligible for conveyance." 24 C.F.R. § 1000.318(a)(1). Downward adjustments in FCAS units would result in less Indian Housing Block Grant money received by the tribe.

HUD informed CTHA that they were one of the Tribal Housing Authorities under review. During the course of the review, the record reflects that there were ongoing communications between the parties regarding eligibility of certain Mutual Help and Turnkey housing units from 1998-2002. Ultimately, HUD concluded that CTHA had improperly received payments for a number of units that were no longer FCAS eligible under 24 C.F.R. § 1000.318(a*)*. Under 24 C.F.R. § 1000.318(a), Mutual Help and Turnkey III eligibility for federal payments generally do not exceed 25 years since that is the term of the lease-purchase agreement when the title was conveyed or should have been conveyed. Under the regulation, at that the conclusion of the lease-to-own period, the Tribal Housing Authorities have no legal right to own, operate, or maintain these premises and therefore are ineligible for federal payments for these units under NAHASDA. HUD provided CTHA with numerous opportunities to provide information to show that the excluded units should be counted under FCAS. When CTHA failed to respond, HUD adjusted future Indian Housing Block Grant payments to CTHA in order to recoup the prior years' over-payed funds.

In April 2004, CTHA requested HUD perform an on-site review of CTHA's tenant housing files. In August 2004, HUD personnel visited CTHA's facility and reviewed 220 of CTHA's Mutual Help and Turnkey tenant housing files. After

the visit, HUD concluded that of those 220 houses, 42 had been paid off and conveyed, 9 had been paid-off but not conveyed, 53 were occupied by subsequent homebuyers and 114 were past their 25-year lease, were not paid-off, were not conveyed and were still occupied by original lessee/homebuyers. AR 618-620. Consequently, HUD disqualified the 114 housing units from CTHA's FCAS count.

Citing 24 C.F.R. § 1000.318(a), HUD noted that the FCAS allocation formula required that these 114 housing units no longer be counted after they were conveyed or should have been conveyed under the terms of the lease-purchase agreement. To the extent that homebuyers were delinquent on payments due under the lease-purchase agreement, conveyance, for purposes of FCAS counting, was still practical because a promissory note could be issued. AR 525-526 (NAHASDA Guidance, No. 98-19).

Ultimately, HUD calculated that CTHA had been over-payed in the amount of $1,919,666 and initiated reductions in the Crow Tribe's NAHASDA block grants in subsequent grant years in order to recoup these monies. AR 618-621.

## III. STANDARD OF REVIEW

The Administrative Procedures Act ("APA") requires that a reviewing court "shall ... hold unlawful and set aside agency action, findings, and conclusions

found to be-arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This arbitrary and capricious standard is deferential and as such, an agency will be reversed as arbitrary and capricious "only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 656 (9th Cir.2009).

Nevertheless, the Court must review the administrative action to ensure that the agency has sufficiently "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43(1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). In reviewing the agency's explanation, the court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *Bowman Transp. Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 285(1975)); *see also Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971).

Exercising jurisdiction under the APA, the court must determine whether the agency's action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). "Statutory interpretation begins with the words Congress has chosen." *Fort Peck Hous. Auth. v. United States Dep't of Hous. and Urban Dev.*, 367 Fed.Appx. 884, 889 (10th Cir. 2010), cert. denied, 131 S.Ct. 347 (2010). The court enforces the statute's plain meaning. *Id.* If the language is clear and unambiguous, the court's inquiry ends. However, where an ambiguity exists or "irrational results arise from the statute's literal wording," the court is to apply additional interpretive tools to ascertain and give effect to Congress's intent. *Id.*

## IV.   ANALYSIS

There is apparently no dispute as to the relevant facts. The motions raise the following issues:

(1) Whether HUD has acted beyond its authority by reducing CTHA's grants based on alleged noncompliance, or by recapturing and deducting grant amounts already expended on affordable housing activities?

(2) Whether HUD failed to follow the procedures required by law by taking actions affecting grant amounts without providing notice and opportunity for a hearing?

(3) Whether HUD's FCAS decision was unsupported by substantial evidence where HUD made no determination that CTHA had lost the legal right to own, operate and maintain the disputed houses?

(4) Whether HUD's FCAS decision was arbitrary and capricious where Congress required CTHA's grant allocations to be based on the number of 1937 Act houses owned or operated by CTHA and HUD disqualified dozens of such houses from CTHA's FCAS?

Because HUD failed to provide CTHA the requisite hearing, the Court does not reach issues 3 and 4.

> **1.    Whether HUD's FCAS decision was arbitrary and capricious where Congress required CTHA's grant allocations be based on the number of 1937 Act houses owned or operated by CTHA and HUD disqualified dozens of such houses from CTHA's FCAS.**

CTHA contends that HUD, in deciding to reduce future grant monies in order to recoup alleged overpayments, is acting in excess of its statutory authority. The agency decision giving rise to CTHA's alleged injuries turns on the calculation of Formula Stock. Specifically, HUD determined that CTHA had improperly received payments for a number of units that were no longer FCAS eligible under 24 C.F.R. § 1000.318(a). In NAHASDA, Congress directed HUD to "establish a formula to provide for allocating amounts available for a fiscal year for block grants under [the] Act among Indian tribes...." 25 U.S.C. § 4152(a). The block grant formula was to "be based on factors that reflect the need of the Indian

tribes and the Indian areas of the tribes for assistance for affordable housing activities." *Id.* This included the "number of low-income housing dwelling units owned or operated at the time pursuant to a contract between an Indian housing authority for the tribe and the Secretary." *Id* . The block-grant formula can be found at 24 C.F.R. §§ 1000.301–1000.340.

The formula consisted of two separately calculated components: "Formula Current Assisted Housing Stock" units ("FCAS") and "Need." 24 C.F.R. § 1000.310. Current units were calculated to include all dwelling units owned or operated by an entity as of September 30, 1997, and limited other units. 24 C.F.R. §§ 1000.312, 1000.314.

To determine the amount of funding a Tribal Housing Entity would receive in a particular fiscal year, HUD applied the formula by first calculating the number of current units a Tribal Housing Entity owned or operated and then earmarking funds from the total appropriation to fund them. *Fort Peck*, 367 Fed.Appx. at 887. The agency then established the current need portion for each Tribal Housing Entity "by applying preset weighted criteria to the remaining amount of appropriated funds." *Id.* "Because the funds earmarked for the current unit portion of the formula directly reduced the amount of funding available for current need

disbursement, the current units component was of primary importance to Tribal Housing Entities." *Id.*

"The current units calculation for an individual Tribal Housing Entity began with the number of dwelling units owned or operated by that entity at the time of NAHASDA's enactment." *Id.* In subsequent years that number decreased as some rent-to-own units were eligible to be transferred from the tribal housing entity's inventory or otherwise disposed of pursuant to a contract, such as a lease-to-own agreement, between the tribal housing entity and the unit's occupant. *Id.* HUD reflected this reduction by a downward adjustment in the current units calculation, which was "equal to the number of dwelling units a tribe 'no longer has the legal right to own, operate, or maintain ... whether such right is lost by conveyance, demolition, or otherwise.'" 24 C.F.R. § 1000.318(a). Finally, HUD relied on information provided annually by the individual tribal housing entities on the Formula Response Form to determine the number of disqualified units. 24 C.F.R. § 1000.312; *Fort Peck*, 367 Fed.Appx. at 887.

Relying on this response form, HUD would reduce the current units calculation by "the number of dwelling units a tribe 'no longer has the legal right to own, operate, or maintain ... whether such right is lost by conveyance, demolition, or otherwise.'" 24 C.F.R. § 1000.318(a). The regulations required

units to be removed from a Tribal Housing Entity's inventory "as soon as practicable after the unit becomes eligible for conveyance." 24 C.F.R. § 1000.318(a)(1).

As can be seen from these regulations and given the purpose of the Indian Block Housing Grant formula and its consideration of FCAS and need, any erroneous FCAS calculations would have a direct effect on the amount of funds available for need.

In *Fort Peck*, the Tenth Circuit reviewed § 1000.318 and concluded that it complied with § 4161 and the mandate set forth in NAHASDA. *Id.*, 367 Appx. at 891. In reaching that conclusion, the court stated that,

> HUD determined the funding of units no longer owned or operated by a Tribal Housing Entity decreased the amount of remaining funds available to fund the current need of all tribal programs. Thus, it incorporated a corresponding reduction in the current units portion of the formula funding and effectively increased the amount of funding available for the current need portion of the formula. Interpreting § 4152(b)(1) to prohibit a reduction in the number of current units corresponding to a measurable reduction in responsibility by the Tribal Housing Entity for those units is inconsistent with the statute's plain language and is contrary to Congress's unambiguous intent that the funding formula relate to the needs of all tribal Housing Entities. *Id.*

Although the Tenth Circuit decision is not binding, this Court finds its holding to be persuasive. CTHA asks this Court to interpret Congress to have intended CTHA's grant allocations to be based on the number of houses owned or

operated by CTHA in 1997 rather than allow HUD to adjust it based on

conveyance, demolition, or otherwise.  However, CTHA's approach has no

support in the Congressional record.  Rather, the number of housing units owned

by CTHA in 1997 was only to be used as a starting point for the IHBG formula

calculation.  *Id.*; *see also Absentee Shawnee Housing v. U.S. Department of

Housing and Urban Development,* 2012 WL 3245953 (W.D.Okla.,2012).  The

Congressional mandate under NAHASDA to HUD was that the IHBG formula

"reflect the need of the Indian tribes and the Indian areas of the tribes for

assistance for affordable housing activities."  25 U.S.C. § 4152(b).  To give

credence to CTHA's argument that the FCAS count and its attendant funding

amounts should be a static amount would run contrary to this mandate.

Therefore, this Court finds that § 100.318 is a valid implementation of

Congressional intent in the enactment of § 4161.  CTHA's Motion for Summary

Judgment on this ground must therefore be denied.

> **2.     Whether HUD failed to follow the procedures required by law by taking actions affecting grant amounts without providing notice and opportunity for a hearing.**

CTHA alleges HUD failed to follow the procedures required by law by

taking actions affecting grant amounts without providing notice and opportunity

for a hearing.  HUD's statutory authority regarding monitoring, auditing and

reviewing of NAHASDA grants is found at Title IV of NAHASDA, Sections 401

and 405, or 25 U.S.C. §§ 4161 and 4165, respectively.

Looking at § 4165, as amended in 2000, that Section allows for audits and

reviews of tribal housing entities to insure that they are in compliance with

NAHASDA's requirements. This includes determination of whether eligible

activities are being performed in a timely manner, certification, compliance with

the specific tribe's Indian housing plan, verification of accuracy of information,

on-site visits, grant recipient's right to review of reports and public availability.

25 U.S.C. § 4165(a) - ( c). In addition, that same Section states:

> (d) Effect of reviews
>
> Subject to section 4161(a) of this title, after reviewing the reports and
> audits relating to a recipient that are submitted to the Secretary under
> this section, the Secretary may adjust the amount of a grant made to a
> recipient under this chapter in accordance with the findings of the
> Secretary with respect to those reports and audits.

25 U.S.C. § 4165(d).

Subsection 4165(d) was amended in 2000. It was previously codified at 25

U.S.C. § 4165(c) and read as follows:

> (c) Effect of reviews
>
> The Secretary may make appropriate adjustments in the amount of the
> annual grants under this chapter in accordance with the findings of
> the Secretary pursuant to reviews and audits under this section. The

Secretary may adjust, reduce, or withdraw grant amounts, or take other action as appropriate in accordance with the reviews and audits of the Secretary under this section, *except that grant amounts already expended on affordable housing activities may not be recaptured or deducted from future assistance provided on behalf of an Indian tribe*.

25 U.S.C. § 4165(c)(1999) (emphasis added)

Regarding § 4161, as amended in 2008, which is referenced in § 4165(d), that section states, in relevant part:

### § 4161. Remedies for noncompliance

(a) Actions by Secretary affecting grant amounts

(1) In general

Except as provided in subsection (b) of this section, if the Secretary finds after reasonable notice and opportunity for hearing that a recipient of assistance under this chapter has failed to **comply substantially** (emphasis added) with any provision of this chapter, the Secretary shall–
(A) terminate payments under this chapter to the recipient;
(B) reduce payments under this chapter to the recipient by an amount equal to the amount of such payments that were not expended in accordance with this chapter;
(C) limit the availability of payments under this chapter to programs, projects, or activities not affected by such failure to comply; or
(D) in the case of noncompliance described in section 4162(b) of this title, provide a replacement tribally designated housing entity for the recipient, under section 4162 of this title.

(2) Substantial noncompliance

The failure of a recipient to comply with the requirements of section 4152(b)(1) of this title regarding the reporting of low-income dwelling units shall not, in itself, be considered to be **substantial noncompliance** (emphasis added) for purposes of this subchapter. *Id.*

HUD regulations define "substantial noncompliance":

### § 1000.534 What constitutes substantial noncompliance?

HUD will review the circumstances of each noncompliance with NAHASDA and the regulations on a case-by-case basis to determine if the noncompliance is substantial. This review is a two step process. First, there must be a noncompliance with NAHASDA or these regulations. Second, the noncompliance must be substantial. A noncompliance is substantial if:

(a) The noncompliance has a material effect on the recipient meeting its major goals and objectives as described in its Indian Housing Plan;
(b) The noncompliance represents a material pattern or practice of activities constituting willful noncompliance with a particular provision of NAHASDA or the regulations, even if a single instance of noncompliance would not be substantial;
(c) The noncompliance involves the obligation or expenditure of a material amount of the NAHASDA funds budgeted by the recipient for a material activity; or
(d)  The noncompliance places the housing program at substantial risk of fraud, waste or abuse.

 24 C.F.R. § 1000.534.

 CTHA argues that § 4161 and its implementing regulation § 1000.534 provide the exclusive vehicle by which Defendants may sanction Plaintiff for any alleged noncompliance.  Specifically, CTHA argues that although § 4161 allows

for sanctions for "substantial noncompliance," prior to any imposition of sanctions, an Indian Housing Block Grant recipient must receive reasonable notice as well as an opportunity for a hearing.  Further, under § 4161's noncompliance scheme, CTHA contends that any reduction of payments by HUD for noncompliance is limited to payment amounts not yet expended on NAHASDA activities.

According to the briefs, it is undisputed that CTHA did not have an opportunity for a hearing and a finding that it had been in substantial noncompliance.  In addition, CTHA asks this Court to review HUD's own administrative rule, which provides:

### § 1000.532 What are the adjustments HUD makes to a recipient's future year's grant amount under section 405 of NAHASDA?

(a) HUD may, subject to the procedures in paragraph (b) below, make appropriate adjustments in the amount of the annual grants under NAHASDA in accordance with the findings of HUD pursuant to reviews and audits under section 405 of NAHASDA. HUD may adjust, reduce, or withdraw grant amounts, or take other action as appropriate in accordance with the reviews and audits, *except that grant amounts already expended on affordable housing activities may not be recaptured or deducted from future assistance provided on behalf of an Indian tribe.*
(b) Before undertaking any action in accordance with paragraphs (a) and (c) of this section, HUD will notify the recipient in writing of the actions it intends to take and provide the recipient an opportunity for an informal meeting to resolve the deficiency. In the event the deficiency is not resolved, HUD may take any of the actions available

under paragraphs (a) and (c) of this section. However, the recipient may request, within 30 days of notice of the action, a hearing in accordance with § 1000.540. The amount in question shall not be reallocated under the provisions of § 1000.536, until 15 days after the hearing has been held and HUD has rendered a final decision.
(c) Absent circumstances beyond the recipient's control, when a recipient is not complying significantly with a major activity of its IHP, HUD shall make appropriate adjustment, reduction, or withdrawal of some or all of the recipient's subsequent year grant in accordance with this section.[2]

24 C.F.R. § 1000.532 (emphasis added).

The aforementioned language would presumably settle the issue in CTHA's favor. But CTHA's argument presupposes that it has expended its grant monies and the record is not clear on this issue. Moreover, CTHA has failed to demonstrate that § 1000.532(a) applies here, in the absence of "findings of HUD pursuant to reviews and audits under section 405 of NAHASDA." *Absentee Shawnee Housing v. U.S. Department of Housing and Urban Development*, 2012 WL 3245953 at *5 (W.D.Okla., 2012).

In the alternative, HUD argues that § 4161 and § 4165 are inapplicable to the instant action. Rather, HUD contends that errors in Formula Stock counts, which is what it alleges is at issue here, does not constitute substantial noncompliance. Doc. 61, p. 45. Specifically, HUD argues that CTHA alleges that

---

[2]The Court notes that effective January 2, 2013, § 1000.532 has been revised to exclude the preclusion of recapture of expended funds.

the "Housing Authority's procedural claim ignores the statutory distinction and the nature of HUD's actions by confounding HUD's correction of misallocations with actions to enforce grantee compliance." *Id.* at 46. Rather, HUD argues that it makes no allegation that CTHA acted in substantial noncompliance with NAHASDA. Instead, HUD contends that its actions are solely to correct its own error regarding CTHA's formula allocations. *Id.* at 49. HUD does acknowledge that, regardless of the manner of the deprivation, the end result of either approach would deprive CTHA of grant funds. However, HUD argues that the law distinguishes between the "what, why, and how of any deprivation." *Id.* at 46.

HUD directs the Court to the legislative history regarding NAHASDA's amendment in 2008. It contends that in amending NAHASDA, Congress was aware of HUD's efforts to recover overpayments relating to over-counting of Formula Stock. Specifically, HUD cites S. Rep. No. 110-238, at 9 (2007), wherein the Senate Committee was aware of the need for removal of ineligible units from the funding calculations and efforts to have grant recipients pay back funds from ineligible units that were included in the Formula Stock count. HUD argues that rather than stopping this recovery, Congress specifically enacted § 4161(a)(2) to ensure that the counting of these ineligible units that were included in the Formula Stock calculation did not constitute a substantial noncompliance.

18

In the alternative, HUD argues that, like all federal agencies, HUD has the inherent authority to recover funds that were wrongfully, erroneously, or illegally paid. *United States v. Wurts*, 303 U.S. 414, 415 (1938). HUD contends that in *Wurts*, the Supreme Court concluded that an agency does not require statutory authority to recover such overpayments because the right exist independent of statute. *Id.* In addition, HUD contends that it need not file suit to establish the illegality of the payment and may administratively offset the debts from amounts otherwise owed to the debtor. *Grand Trunk Western Ry. Co. v. United States*, 252 U.S. 112, 121 (1920); *see also United States v. Munsey Trust Co.*, 332 U.S. 234, 239 (1947).

Recently, in *Lummi Tribe, et al. v. United States*,106 Fed.Cl. 623 (Fed. Cl. 2012), the United States Court of Federal Claims issued an opinion that is both relevant and persuasive. The *Lummi* court was asked to determine whether HUD's administrative recapture of grant funds through offsets in future grant funding could only be done under the procedures laid out in 25 U.S.C. § 4165 or through the federal government's common law right to recover funds that the agency has "wrongfully, erroneously, or illegally paid." 106 Fed.Cl. at 615*, citing Wurts,* 303 U.S. at 415.

*Lummi* concluded, based upon clear Supreme Court precedent, that where there is a statutory scheme in place that directly speaks to an issue, the inherent federal common law right is displaced. 106 Fed.Cl. at 631-32. This Court agrees with the *Lummi* court that § 4165 applied and HUD was not free to disregard the requirements of § 4165 "in favor of a common-law remedy with no apparent rules or limitations. Resort to federal common law is appropriate only when a statute does not speak to an issue. . . But where, as here, Congress has spoken to the question, HUD may not circumvent that statutory scheme." *Lummi,* 106 Fed.Cl. at 632, *citing City of Milwaukee v. Illinois and Michigan*, 451U.S. 304, 319 n.14 (1981) and *American Elec. Power Co. v. Connecticut*, _U.S._, 131 S. Ct. 2527, 2537 (2011).

Here, a reading of §§ 401 and 405 and its implementing regulations leads to the conclusion that a statutory vehicle exists through which HUD may recover any tribal housing grant overpayments. To allow HUD to utilize a common law right of recovery in lieu of the existing statutory framework of § 4165 would render the congressional intent and purpose of the non-compliance provision meaningless.

To the extent that HUD argues the 2008 Congressional amendments to NAHASDA specifically excluded FCAS counting from being a substantial non-compliance, this Court finds this argument unavailing. The relevant 2008

amendment that HUD relies on is found at § 4161(a)(2) and states, in pertinent

part,

>(2) Substantial noncompliance
>
>The failure of a recipient to comply with the requirements of section 4152(b)(1) of this title regarding the reporting of low-income dwelling units shall not, in itself, be considered to be substantial noncompliance for purposes of this subchapter.  25 U.S.C. § 4161(a)(2)(2008).

Here, Plaintiff contends that HUD had begun recapturing its funds as early as

2002.  Since HUD's actions that gave rise to Plaintiff's alleged injuries began

before the 2008 amendments took place, Defendant cannot rely upon § 4161(a)(2)

to circumvent §§ 4161 and 4165's remedial scheme. The Reauthorization Act of

2008 was a substantive change in the NAHASDA's statutory framework.  It

cannot be read as a clarification of pre-existing law and it cannot be given

retroactive effect to these disputes.  *Fort Peck*, 2012 WL 3778299 at * 7

(D.Colo.,2012).

  Because this Court finds that the remedial scheme of sections 4161 and

4165 applies, the question then becomes whether before reducing payments under

NAHASDA, Defendant adequately provided Plaintiff with notice and a hearing as

required under 25 U.S.C. § 4161(a) and 24 CFR § 1000.532.  In the instant case,

HUD concedes that CTHA has not had an opportunity for a hearing.  Rather, HUD

argues that under CTHA's analysis, "a hearing would be a mere formality . . ." Doc. 61, p.45.

A reading of § 4165 reveals that it grants HUD broad authority for audits and reviews of tribal housing entities to ensure that they are in compliance with NAHASDA's requirements. This includes determinations of whether eligible activities are being performed in a timely manner, certification, compliance with the specific tribe's Indian housing plan, verification of accuracy of information, on-site visits, grant recipient's right to review of reports and public availability. 25 U.S.C. § 4165(a) - ( c). Clearly, but for this broad audit and review authority, HUD would never have discovered any alleged FCAS over-counting by CTHA. Further, it is undisputed that HUD acted under this review and audit authority and adjusted the amount of future grants made to CTHA in accordance with its findings. 21 U.S.C. § 4165(d); *see also Lummi*, 106 Fed.Cl. at 632. Because HUD acted under § 4165, HUD cannot avoid NAHASDA's notice and hearing provisions of 24 CFR § 1000.532.

Regardless of the reasons behind their decision, HUD intended to deprive CTHA of future IHBG funds to recover alleged over-paid past funds. CTHA contends these funds amount to almost $2 million. Given the amount of money involved and the effect such a deprivation would have on the CTHA's housing

projects, it is reasonable to allow CTHA an opportunity for hearing regardless of whether it is a "mere formality."

For those reasons, this Court finds that Defendant HUD acted arbitrarily and capriciously when it violated Plaintiff CTHA's right to NAHASDA's Notice and Hearing requirements for substantial noncompliance. Plaintiff's Motion for Summary Judgment on this ground must therefore be granted.

## V.    ORDER

Having concluded that HUD failed to provide CTHA with a hearing, the analysis ends here.

Accordingly, IT IS ORDERED that:

1.    Plaintiff's Motion for Summary Judgment (doc. 51) IS DENIED IN PART and GRANTED IN PART as stated herein.

2.    Defendant's Cross-Motion for Summary Judgment (doc. 60) is DENIED IN PART and GRANTED IN PART as stated herein.

3.    This case shall be remanded back to the agency for hearing and review consistent with this Order.

The Clerk of Court is directed to enter judgment accordingly.

DATED this 14th day of February, 2013.

_/s/ Richard F. Cebull_____
RICHARD F. CEBULL
U.S. DISTRICT JUDGE